No. 24-1838

# In the United States Court of Appeals for the Ninth Circuit

ANDREW KING, on behalf of himself and all others similarly situated,
*Plaintiff-Appellant,*

v.

NAVY FEDERAL CREDIT UNION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California (Los Angeles)
Case No. 2:23-cv-05915-SPG-AGR (Hon. Sherilyn Peace Garnett)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

JEFFREY D. KALIEL
SOPHIA GOREN GOLD
KALIEL GOLD, PLLC
1100 15th Street NW
4th Floor
Washington, DC 20005
(202) 350-4783

MATTHEW W.H. WESSLER
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JENNIFER BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

August 7, 2024

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of authorities ................................................................ ii

Introduction ........................................................................ 1

Jurisdictional statement ......................................................... 4

Statement of the issue ........................................................... 4

Statement of the case ............................................................ 4

    I.    Statutory and regulatory background .................................. 4

    II.   This case .................................................................. 8

Standard of review ............................................................... 13

Summary of argument ........................................................... 13

Argument ........................................................................... 17

    I.    Section 701.35(c) preempts only laws that specifically target credit union activities that comply with federal law ......................................... 20

    II.   Because Navy Federal's returned-check fee violates federal law, Mr. King's claims are not preempted .................................................... 24

    III.  The district court's preemption analysis disregarded § 701.35(c)'s text ....................................................................... 30

Conclusion ......................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Aguayo v. U.S. Bank,*
    653 F.3d 912 (9th Cir. 2011) ................................................... 18

*BNSF Railway Co. v. Seats, Inc.,*
    900 F.3d 545 (8th Cir. 2018) ............................................ 22, 28

*California Restaurant Association v. City of Berkeley,*
    89 F.4th 1094 (9th Cir. 2024) ........................................... *passim*

*Cantero v. Bank of America, N. A.,*
    144 S. Ct. 1290 (2024) .......................................................... 35

*Davis v. HSBC Bank Nevada, N.A.,*
    691 F.3d 1152 (9th Cir. 2012) ............................................... 26

*Davis v. Wells Fargo Bank, N.A.,*
    976 F. Supp. 2d 870 (S.D. Tex. 2013) ................................... 36

*E. & J. Gallo Winery v. EnCana Corp.,*
    503 F.3d 1027 (9th Cir. 2007) ............................................... 24

*F.T.C. v. AMG Services, Inc.,*
    2014 WL 910302 (D. Nev. Mar. 7, 2014) ............................. 30

*F.T.C. v. Neovi, Inc.,*
    604 F.3d 1150 (9th Cir. 2010) .......................................... 26, 27

*First National Bank in St. Louis v. State of Missouri,*
    263 U.S. 640 (1924) ......................................................... 22, 28

*Gutierrez v. Carmax Auto Superstores California,*
    19 Cal. App. 5th 1234 (2018) ............................................... 30

*Gutierrez v. Wells Fargo Bank, NA,*
    704 F.3d 712 (9th Cir. 2012) ........................................... 34, 35

*In re Adobe Systems, Inc. Privacy Litigation,*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) .................................. 29

*Incalza v. Fendi North America, Inc.*,
　479 F.3d 1005 (9th Cir. 2007) .................................................................. 18

*Irigaray Dairy v. Dairy Employees Union Local No. 17 Christian Labor
　Association of the United States of America Pension Trust*,
　153 F. Supp. 3d 1217 (E.D. Cal. 2015) ...................................................... 28

*Kansas v. Garcia*,
　589 U.S. 191 (2020) ...........................................................................13, 17

*Kroske v. U.S. Bank Corp.*,
　432 F.3d 976 (9th Cir. 2005) ..............................................................22, 28

*Lambert v. Navy Federal Credit Union*,
　2019 WL 3843064 (E.D. Va. Aug. 14, 2019) ............................................. 34

*Lilly v. ConAgra Foods, Inc.*,
　743 F.3d 662 (9th Cir. 2014) ............................................................. 13, 25

*Lusnak v. Bank of America, N.A.*,
　883 F.3d 1185 (9th Cir. 2018) ....................................................... 19, 25, 31

*Lussoro v. Ocean Financial Federal Credit Union*,
　456 F. Supp. 3d 474 (E.D.N.Y. 2020) ....................................................... 21

*Martinez v. Wells Fargo Home Mortgage, Inc.*,
　598 F.3d 549 (9th Cir. 2010) ................................................. 15, 28, 29, 35

*Medtronic, Inc. v. Lohr*,
　518 U.S. 470 (1996) ........................................................................... 13, 19

*Merck Sharp & Dohme Corp. v. Albrecht*,
　587 U.S. 299 (2019) ...................................................................... 13, 18, 36

*Morales v. Trans World Airlines, Inc.*,
　504 U.S. 374 (1992) ........................................................................*passim*

*National Credit Union Administration v. First National Bank & Trust Co.*,
　522 U.S. 479 (1998) .................................................................................. 5

*Orkin Exterminating Co. v. F.T.C.*,
　849 F.2d 1354 (11th Cir. 1988) ................................................................. 27

*People ex rel. Renne v. Servantes*,
　86 Cal. App. 4th 1081 (2001) .................................................................29

*Pilot Life Insurance Co. v. Dedeaux*,
　481 U.S. 41 (1987) ..............................................................14, 23, 30

*Sepanossian v. National Ready Mix Co.*,
　97 Cal. App. 5th 192 (2023) ...........................................................27, 29

*Silkwood v. Kerr-McGee Corp.*,
　464 U.S. 238 (1984) .......................................................22, 25, 28, 31

*Smith v. Wells Fargo Bank, N.A.*,
　135 Cal. App. 4th 1463 (2005) .....................................................22, 28, 35

*Spain v. Aetna Life Insurance Co.*,
　11 F.3d 129 (9th Cir. 1993) ..................................................................23

*Standard Insurance Co. v. Morrison*,
　584 F.3d 837 (9th Cir. 2009) ................................................................23

*Total TV v. Palmer Communications, Inc.*,
　69 F.3d 298 (9th Cir. 1995) ...........................................................*passim*

*United States v. 4,432 Mastercases of Cigarettes, More or Less*,
　448 F.3d 1168 (9th Cir. 2006) ...............................................................18

*Ward v. Soo Line Railroad Co.*,
　901 F.3d 868 (7th Cir. 2018) ...........................................................22, 28

*Whittington v. Mobiloil Federal Credit Union*,
　2017 WL 6988193 (E.D. Tex. Sept. 14, 2017) ...........................................35

*Wigod v. Wells Fargo Bank, N.A.*,
　673 F.3d 547 (7th Cir. 2012) .......................................................21, 22, 28

*Wyeth v. Levine*,
　555 U.S. 555 (2009) ...................................................................*passim*

**Statutes**

12 U.S.C. § 1752a ...................................................................................6

iv

12 U.S.C § 1757 ............................................................. 2, 7, 20, 36

12 U.S.C. § 1782 ...................................................................... 6

12 U.S.C. § 1785 ...................................................................... 6

12 U.S.C. § 1787 ...................................................................... 6

12 U.S.C. § 5531 ..................................................................... 25

12 U.S.C. § 5536 .................................................................. 9, 25

28 U.S.C. § 1291 ..................................................................... 4

28 U.S.C. § 1332 ..................................................................... 4

Cal. Bus. & Prof. Code § 17200 ............................................. 11

Federal Credit Union Act of 1934, 12 U.S.C. § 1751 ................ 6

## Rules

12 C.F.R. § 7.4007 ................................................................ 33

12 C.F.R. § 701.21 ................................................................ 33

12 C.F.R. § 701.35 ............................................................. *passim*

49 Fed. Reg. 30683-01 (Oct. 10, 1984) ................................. 33

50 Fed. Reg. 4636 (Feb. 1, 1985) ............................................ 7

## Constitutional Provisions

U.S. Const. art. VI, cl. 2 ................................................... 13, 17

## Other Authorities

Ashley Donohoe,
   *Largest Credit Unions in America*, Market Watch Guides ........... 8

CFPB,
  *Trends in overdraft/non-sufficient fund (NSF) fee revenue and practices* (Apr. 24, 2024) ...... 8

S. Rep. No. 73-555 (1934)............................................................................4, 5

## INTRODUCTION

In July 2022, Andrew King tried to deposit a check in his account at Navy Federal Credit Union. But to his surprise, it bounced. And his surprise only grew from there. Navy Federal then hit him with a "returned check" fee—not for anything that he had done or could have anticipated, but because the check writer gave him a bad check. He spent hours on the phone trying to explain himself in the hopes of securing a refund, but Navy Federal refused.

So Mr. King brought this suit on behalf of himself and the many others against whom Navy Federal assessed this returned-check fee. He alleged that the practice violates California's Unfair Competition Law, which prohibits both unlawful and unfair business practices. Navy Federal's fee is unlawful, Mr. King alleged, because it violates the federal Consumer Financial Protection Act. Indeed, just months after Navy Federal imposed its fee on Mr. King, the Consumer Financial Protection Bureau cautioned exactly that: It announced that "indiscriminate" returned-check fees—which extract penalties from consumers without regard to fault—likely violate the CFPA's prohibition on unfair practices. Mr. King also alleged that Navy Federal's fee violates the Unfair Competition Law's comparable prohibition on unfair practices.

With little discussion, the district court dismissed these claims as preempted. The source of this claimed preemption is not an act of Congress but a regulation that

the National Credit Union Administration promulgated under its authority to prescribe "limitations" on credit unions' terms, rates, and conditions for accounts. *See* 12 U.S.C § 1757(6). The regulation mandates that, when credit unions "determine the types of fees" or "other matters" affecting accounts, they must do so "consistent with" federal law. 12 C.F.R. § 701.35(c). And, the regulation declares that it displaces state laws "regulating *such* activities"—that is, activities that are "consistent with" federal law. *Id.* (emphasis added).

As that text makes clear, the regulation does not preempt Mr. King's claims. First, Mr. King's claims are based on conduct that *violates* federal law, not conduct "consistent with" it. The district court went astray because it believed that the only federal law Navy Federal's conduct might have violated is the Consumer Financial Protection Bureau's guidance document, which is not actually law. But Navy Federal's innocent-consumer returned-check fee violates the Consumer Financial Protection Act, a federal statute, not just agency guidance. Indeed, Navy Federal didn't even try to show otherwise—even though preemption is an affirmative defense on which it bears the burden. That alone is sufficient to defeat Navy Federal's preemption claim.

The district court's preemption determination runs afoul of the regulation's text in another way too: The regulation preempts only state laws "*regulating*" specified credit-union activities. The district court held that this language means that any

state-law claim that "concerns" a credit union's fees is preempted. But as the Supreme Court and this Court have made clear, clauses that preempt state laws "regulating" specified activity are narrower than those that displace all claims that "concern" or "relate to" that activity. State laws "regulating" an activity are laws that specifically target that activity. That does not include generally applicable laws. As this Court has held, California's Unfair Competition Law is a generally applicable law. For that reason, too, Mr. King's claims are not preempted.

The district court's contrary conclusion is at odds not only with the regulation's text, but also with the National Credit Union Administration's statutory authority. Congress narrowly delegated to the NCUA the authority to prescribe "limitations" on account terms, rates, and conditions. It did not authorize the NCUA to preempt any state-law claim that happens to relate to a credit union's account terms—even if it is brought under a generally applicable state law and does not conflict with anything in the statute or NCUA's regulation. The district court's expansive reading of § 701.35(c) takes the regulation beyond what the NCUA had the power to do.

Ultimately, Navy Federal did not and cannot meet its burden to establish preemption. Because Navy Federal's conduct violates federal law and because Mr. King brings his claims under a generally applicable statute, those claims are not preempted. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d) because this is a putative class action in which there are more than 100 members of the proposed class, at least one proposed member is a citizen of a different state than the defendant, and the aggregate amount in controversy exceeds $5 million. *See* ER-40–41. This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted Navy Federal's motion to dismiss on January 26, 2024, ER-16, and judgment was entered on February 26, 2024, ER-88. Mr. King filed a timely notice of appeal on March 26, 2024. ER-81.

## STATEMENT OF THE ISSUE

A regulation issued by the National Credit Union Administration authorizes credit unions to charge fees only in a manner "consistent with" federal law and declares that it displaces state laws "regulating such activit[y]." 12 C.F.R. § 701.35(c). Has Navy Federal carried its burden to show that this regulation preempts a claim under generally applicable state law based on a fee that also violates federal law?

## STATEMENT OF THE CASE

### I. Statutory and regulatory background

**1.** In the early twentieth century, the country faced a "national" "consumer-credit problem." S. Rep. No. 73-555, at 4 (1934). Although some people had access to fair credit, many "had been largely ignored by banks" and were unable "to obtain credit at reasonable rates." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522

U.S. 479, 515 (1998) (O'Connor, J., dissenting).[1] That left these underserved consumers forced to take out "usurious" loans to meet their everyday needs, subjecting them to the abuses of "high rate money-lending business[es]." S. Rep. No. 73-555, at 3.

Credit unions emerged as a solution for these "average working people." S. Rep. No. 73-555, at 2. In their original form, credit unions operated as "self-managed" "cooperative societ[ies]" that supplied "members" with "a simple and convenient system for saving money" and the opportunity to "take care of their own short-term-credit problems at a normal interest rate." S. Rep. No. 73-555, at 1. Each credit union was "limited . . . to the members of a specific group with a common bond of occupation or association (such as the employees of a given industry)." S. Rep. No. 73-555, at 2. And they had an excellent track record during the Great Depression: By its end, credit unions had been formed in 38 states, and they operated "uninterruptedly" and "proved their durability." *Id.*

**2.** Taking stock of this success and credit unions' "great potential value," Congress passed the Federal Credit Union Act in 1934. The statute's goal was to "bring credit relief to the masses of the people"—people who would otherwise be "unable to make a full contribution to industrial recovery because of the waste incidental to interest overcharges" imposed by banks. S. Rep. No. 73-555, at 4. The

---

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

Act permitted any group of seven or more people sharing a "common bond" to come together to form a federally chartered credit union. Federal Credit Union Act of 1934 §§ 3, 9. These credit unions, the Act provided, "shall have power" to, among other things, make contracts; to make loans to members with "maturities not exceeding two years"; and to invest in loans to members or in federally guaranteed securities; and to accept deposits. *Id.* § 7. And the Act assigned the Governor of the Farm Credit Administration to implement the statute, including by "prescrib[ing] rules and regulations for the administration of th[e] Act." *Id.* § 16.

In enabling federally chartered credit unions, however, nothing in the Act displaced state law. And despite repeatedly amending the Act since then, Congress has never added a general preemption provision. To the contrary, several provisions of the Act make clear that Congress intended state law to apply unless it specifically said otherwise. *See, e.g.*, 12 U.S.C. § 1782(a)(6) (providing that audit standards shall exist "notwithstanding . . . State law"); *id.* § 1785(g) (allowing the charging of certain interest rates "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this subsection"); *id.* § 1787(c)(8)(A) (providing certain contractual rights "notwithstanding . . . the law of any State").

**3.** The power once vested in the Governor of the Farm Board now rests with the National Credit Union Administration, or NCUA. 12 U.S.C. § 1752a(a)–(b). In addition to the NCUA's general authority (originally granted to the Governor) to

6

promulgate regulations to "administ[er]" the Act, the agency today possesses authority to constrain some of the powers conferred on credit unions. That includes the authority to limit the terms credit unions may impose on accounts. Although a credit union's board of directors may establish the "terms, rates, and conditions" governing accounts, it must do so "within limitations prescribed by" the NCUA. *Id.* § 1757(6).

Invoking its statutory authority to set "limitations" on the "terms, rates, and conditions" for accounts, *id.* § 1757(6), 50 Fed. Reg. 4636, 4636 (Feb. 1, 1985), the NCUA has issued a rule to govern how credit unions set fees and "other matters" for accounts. In full, the regulation currently reads,

> A Federal credit union may, consistent with this section, parts 707 and 740 of this subchapter, other federal law, and its contractual obligations, determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account. State laws regulating such activities are not applicable to federal credit unions.

12 C.F.R. § 701.35(c). In its first sentence, this regulation limits credit unions' power to "determine the types of fees or charges" affecting accounts, to when they do so "consistent with" a series of legal obligations: They must comply with "this section"—that is, § 701.35(b)—which prohibits misleading representations about account terms; "Parts 707 and 740," which implement the Truth in Savings Act and set disclosure requirements; "other federal law"; and credit unions' "contractual obligations." 12 C.F.R. § 701.35(c). In its second sentence, the regulation declares that

7

it is deeming "not applicable"—*i.e.*, preempting—"[s]tate laws regulating such activities." As a whole, then, the regulation preempts state laws "regulating" credit unions' fee practices when those practices are "consistent with" federal law.

## II. This case

**1.** Navy Federal Credit Union is the nation's largest credit union. As anyone familiar with its ubiquitous television commercials knows, Navy Federal offers banking services to members of the armed forces and their families, billing itself as "dedicated to fostering financial health and well-being for the military, veterans, and their families."[2] Navy Federal's $160 billion in assets is three times greater than the next biggest credit union, and it boasts 13 million customers—four times as many as the next largest.[3]

All of its members are subject to a penalty fee for "returned checks"—that is, a fee when a check bounces. ER-75. But this fee isn't assessed when the Navy Federal member writes a bad check; it's assessed, instead, when the Navy Federal member tries to deposit a bad check that *someone else* wrote. ER-19. This occurs when, for example, the check writer has insufficient funds in their account, directs their own bank to stop payment before the check is deposited, or writes the check from a closed

---

[2] *About Navy Federal Credit Union*, Navy Federal Credit Union, https://perma.cc/2ZZY-PV8Y.

[3] Ashley Donohoe, *Largest Credit Unions in America*, Market Watch Guides, https://perma.cc/ENQ6-DGDE; CFPB, *Trends in overdraft/non-sufficient fund (NSF) fee revenue and practices* (Apr. 24, 2024), https://perma.cc/6U7K-STFL.

8

account. ER-21–22. And that means, in other words, that Navy Federal assesses the fee when the person depositing the check has "no reason to anticipate that" it will bounce and "no control over" the circumstances leading to the bounced check because it is the check writer that's at fault. ER-22. The end result is that Navy Federal's members not only lose out on much needed money, but also are forced to pay an unanticipated fee for complications caused by third parties.

The federal Consumer Financial Protection Bureau, or CFPB, has cautioned that this exact type of "blanket" returned-check fee—assessed "indiscriminately" and without regard to the fault of the person attempting the deposit—is likely "unfair," and thus unlawful, under the Consumer Financial Protection Act. ER-60; 12 U.S.C. § 5536(a)(1)(B) (prohibiting "unfair, deceptive, or abusive act[s] or practice[s]"). That's not just because consumers ordinarily cannot foresee that a check someone else wrote will bounce and are "normally [un]able to verify" that it will clear, but also because consumers do not benefit from these fees. ER-52. Because indiscriminate returned-check fees target unwitting check depositors, rather than the at-fault check writers, they do not deter bounced checks. *Id.* And, the CFPB concluded, "even assuming [] 100%" of the collected fees were put to lowering the "front-end cost" of services and improving quality—an obviously unlikely scenario—the minimal benefits that individual consumers would enjoy would not outweigh the harm

imposed on the consumers who bear the burden of paying for third-parties' wrongdoing. ER-64.

And in Navy Federal's case, it assesses these fees despite using its contract with members to shield itself from any risks related to bounced checks. When a consumer attempts to deposit a check, Navy Federal does not have to make the funds available until the end of the next business day. ER-69. It can delay that time even further if it "believe[s] a check [the consumer] deposit[s] will not be paid," ER-72—a reservation that likely covers most scenarios in which the consumer could know a check would bounce and thus could plausibly be at fault. And if funds are made available but the check later bounces, Navy Federal can "charge back" that amount to the account holder or otherwise "claim a refund." ER-73.

Despite these contractual protections—and despite the lack of any benefit to its members—Navy Federal automatically charges consumers a $15 fee whenever a check bounces. That includes when a consumer attempts to deposit a check, but Navy Federal discovers that the check is flawed *before* it makes any money available. ER-19. And, Navy Federal will not refund the fee even if the consumer explains that they bore no responsibility for the check bouncing. ER-27.

**3.** That's what happened to Andrew King, an accountholder and member of Navy Federal. ER-20. In July 2022, he tried to deposit a check into his account, but Navy Federal rejected the attempted deposit. ER-27. Already faced with the

frustration of his check not being accepted, Mr. King then got hit with Navy Federal's $15 returned-check fee. *Id.*

Because the check bounced to his "surprise, and by no fault of his own," Mr. King asked Navy Federal to refund the fee. *Id.* He called Navy Federal twice, spending hours on the phone navigating its customer service process. *Id.* But, in the end, Navy Federal refused to refund the fee. *Id.*

**4.** So Mr. King brought this suit on behalf of himself and all other Navy Federal accountholders who had been charged a returned-check fee merely for attempting to deposit a check that was rejected. ER-28. Mr. King alleged that Navy Federal's practice of assessing a penalty even when the consumer is not at fault and even when the funds from the check have not been made available violates California's Unfair Competition Law, which prohibits "unfair" and "unlawful" business practices. ER-32; Cal. Bus. & Prof. Code § 17200.[4] The practice is "unfair" because Navy Federal assesses a fee for something the consumer cannot reasonably avoid and may not even be aware of, without any corresponding benefit to the consumer and even when Navy Federal faces no risk because the attempted deposit fails from the outset. ER-32–33; ECF 25 at 15. And the practice is "unlawful" because it violates the federal Consumer Financial Protection Act's similar prohibition on

---

[4] Mr. King also alleged that Navy Federal's fee breached its contractual commitments and that the fee was fraudulent under the Unfair Competition Law. Those claims are not at issue in this appeal.

unfair practices. ER-32. Navy Federal moved to dismiss, arguing, among other things, that the regulatory preemption clause, § 701.35(c), bars Mr. King's claims.

The district court agreed with Navy Federal and dismissed Mr. King's claims. ER-12–14. Although § 701.35(c) preempts only state laws "regulating" specified credit union activities, the court held that if a claim—under any state law—merely "concerns" a credit union's "fee charging practices," then it is preempted. ER-14. Because Mr. King's claim satisfied that broad test, the court held that § 701.35(c) barred it. *Id.*

In reaching this conclusion, the court appeared to recognize—and Navy Federal never contested—that preemption under § 701.35(c) only extends, as the plain text states, to activities "consistent with" federal law. ER-13. And Mr. King alleges that Navy Federal's fees violate federal law. Nonetheless, the court held that his claims were preempted anyway because it believed they were based solely on the CFPB's advisory guidance. ER-14. The court thus reasoned that allowing Mr. King's claims to proceed would impermissibly give that guidance the "force and effect of law." *Id.* And with that concern driving its decision, the district court dismissed Mr. King's claims without determining—one way or the other—whether Navy Federal's fee practices actually complied with the CFPA's prohibition on "unfair" practices.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss on preemption grounds de novo, accepting all allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 664 (9th Cir. 2014).

## SUMMARY OF ARGUMENT

**I.** The Supremacy Clause provides that the "laws of the United States" "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. But there is no federal preemption unless federal law compels it. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Preemption therefore "must stem from either the Constitution itself or a valid statute enacted by Congress." *Id.* at 202. And an agency only has the power to preempt state law when it acts within the scope of its congressionally delegated authority. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019).

When, as here, a regulation expressly preempts state law, the "focus" must be on the "plain meaning of the preemption provision." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). Only state laws that come within the scope of an express preemption provision must give way to it. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996). And, because preemption is an affirmative defense, it is the defendant's burden to demonstrate that nullification of state law is required. *E.g.*, *Wyeth v. Levine*, 555 U.S. 555, 569 (2009).

A focus on the text of the regulation here reveals two limits on its preemptive scope. First, it reaches only credit unions' fee practices that comply with federal law. The first sentence of 12 C.F.R. § 701.35(c) limits credit unions' power to "determine" the "fees or charges" affecting the "opening, maintaining and closing" of customer accounts to when they do so "consistent with" federal law. The second sentence— the preemption clause—then protects "such activities" from state laws regulating them. *Id.* By limiting the clause's reach with the modifier "such," the regulation shields from state law only that which came before it—fees that comply with federal law.

Second, because § 701.35(c)'s preemption clause applies only to state laws "regulating" credit unions' fee practices, it does not displace generally applicable state laws. As both this Court and the Supreme Court have made clear, unlike clauses that broadly preempt any claim that "relates to" or "concerns" a federally regulated activity, clauses that preempt only state laws "regulating" that activity capture only laws *specifically targeting* it. *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987); *Total TV v. Palmer Commc'ns, Inc.*, 69 F.3d 298, 302 (9th Cir. 1995). They do not displace generally applicable laws. *See, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 385 (1992).

**II.** Because preemption is an affirmative defense, it was Navy Federal's burden to demonstrate that Mr. King's claims are preempted. But it did not satisfy either of § 701.35(c)'s requirements.

*First*, Navy Federal did not even try to establish that its returned-check fee is "consistent with" federal law, in particular, the Consumer Financial Protection Act. And it couldn't have anyway. A practice is "unfair"—and thus unlawful—under the CFPA if it injures a large number of consumers, is not reasonably avoidable, and does not confer benefits that outweigh the harm to consumers. Here, thousands have been injured to the tune of millions of dollars. Navy Federal assesses the fee without regard to fault, meaning that its customers cannot avoid it. And consumers see no benefit from these fees. That is why the Consumer Financial Protection Bureau has specifically warned that this very type of no-fault fee is likely unlawful.

*Second*, even if Navy Federal could demonstrate that its fee complies with federal law, it still would have to demonstrate that California's Unfair Competition Law specifically targets credit union fees. It did not—and cannot—do so. As this Court has recognized, California's Unfair Competition Law is a law of "general application" that reaches businesses of all stripes and a wide range of unlawful and unfair activities. *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010). It thus does not fall within the scope of § 701.35(c)'s preemption clause.

**III.** The district court concluded otherwise by making two errors. To begin, it never required Navy Federal to satisfy its burden of demonstrating that the returned check fee complies with federal law—the necessary first step for preemption under § 701.35(c). Instead, the court essentially required Mr. King to disprove preemption. It then concluded that he had not done so because it believed that Mr. King alleged only a violation of the CFPB's *guidance*, which does not have the "force" of law. But the court misunderstood Mr. King's claims. Mr. King asserts that Navy Federal's fees violate the Consumer Financial Protection Act itself. Although the CFPB's guidance supports Mr. King's interpretation of the Act, the statutory violation exists independent of the CFPB's view. The district court, therefore, should have held that Navy Federal's preemption defense fails from the start.

The court also erred by expanding the preemption clause's scope. Although § 701.35(c) only preempts "state laws regulating" credit union fees, the court held that it bars any claim that "concerns" a credit union's fee practice—including claims under generally applicable state law. But that's the exact mistake that the Supreme Court and this Court have warned against: conflating the narrow term "regulate" with broad preemption terminology like "concerns" or "relates to." *See Morales*, 504 U.S. at 385; *Cal. Rest. Ass'n*, 89 F.4th at 1103. Again, it's well established that a state law regulating an activity is a law that is specifically targeted at that activity, not a law of general application.

Adhering to this longstanding distinction is especially important here, because the National Credit Union Administration lacks the statutory authority to promulgate a more expansive preemption scheme. The statute NCUA administers does not itself preempt state law. Nor did Congress expressly authorize the agency to do so. The NCUA regulation here was promulgated pursuant to the agency's authority to prescribe "limitations" on the terms, rates, and conditions credit unions may impose on their accounts. A broad preemption clause that extends beyond what's necessary to safeguard those limitations would exceed NCUA's authority. Presumably that's why NCUA did not enact such a clause.

This Court should adhere to the text of the clause that the NCUA actually enacted. Under that clause, Mr. King's claims are not preempted.

## ARGUMENT

The Supremacy Clause provides that the "laws of the United States" "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. But "[t]here is no federal preemption *in vacuo*." *Kansas*, 589 U.S. at 202. There must be some "law[] of the United States" that displaces state law. U.S. Const. art. VI, cl. 2. In other words, preemption "must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas*, 589 U.S. at 202. An agency therefore may preempt state law "only when and if [it] is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly

enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Albrecht*, 587 U.S. at 315. In this way, "the purpose of Congress" remains "the ultimate touchstone in every pre-emption case." *Wyeth*, 555 U.S. at 565.

When it does exist, "[p]reemption can occur in one of three ways." *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 n.2 (9th Cir. 2007). "Field preemption" occurs when Congress has regulated in an area "so pervasive[ly]" that it "must have intended to leave *no room* for the states to supplement it." *Aguayo v. U.S. Bank*, 653 F.3d 912, 921 (9th Cir. 2011). "Conflict preemption" bars the application of state law "when either 1) it is not possible to comply with the state law without triggering federal enforcement action" or "2) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Incalza*, 479 F.3d at 1009–10. And, under "[e]xpress preemption," Congress "expressly commands that state law on the particular subject is displaced." *United States v. 4,432 Mastercases of Cigarettes, More or Less*, 448 F.3d 1168, 1189 (9th Cir. 2006).

Here, Navy Federal argues that California's Unfair Competition Law is expressly preempted. But it has never claimed that the Federal Credit Union Act itself preempts state law. The Act does not purport to preempt state law, and Navy Federal has never argued that it occupies the field of credit union regulation or that Mr. King's claims would stand as an obstacle to the achievement of Congress's objectives. Instead, Navy Federal argued, and the district court accepted, that

§ 701.35(c)—a regulation promulgated against the backdrop of that congressional silence—bars Mr. King's claims.

Even assuming that the NCUA had authority to promulgate the preemption clause in § 701.35(c), it does not bar Mr. King's claims. Preemption is an affirmative defense. *Wyeth*, 555 U.S. at 569; *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018). And when "confronted with state consumer protection laws, a field traditionally regulated by the states," a defendant "is required" to come forward with "compelling evidence of an intention to preempt." *Lusnak*, 883 F.3d at 1191.

Navy Federal has not done so here. It can't. When, as in this case, express preemption is at issue, the "plain meaning of the preemption provision" must be the "focus." *Cal. Rest. Ass'n*, 89 F.4th at 1101. The first, and critical, step of any express-preemption analysis is therefore to examine the text of the law to "identify the domain expressly preempted by [its] language." *Lohr*, 518 U.S. at 484. And by its plain terms, § 701.35(c) only preempts state law if, first, the credit union's conduct is "consistent with" federal law and, second, the relevant state law is "regulating" such conduct—a term that requires the state law specifically prescribe rules about that conduct.

Navy Federal can make neither showing here. Mr. King's claims are premised on a fee practice that *violates* federal law, and California's Unfair Competition Law

is generally applicable—it does not target credit union activities specifically. For these reasons, the district court was wrong to deem Mr. King's claims preempted.

## I. Section 701.35(c) preempts only laws that specifically target credit union activities that comply with federal law.

Undertaking the necessary inquiry into § 701.35(c)'s text demonstrates that it imposes two prerequisites before state law is displaced: First, the credit union's activities—in particular, the determination of fees or other matters affecting accounts—must comply with federal law, and second, the state law must be specifically directed at those activities.

**1.** Section 701.35(c) has a circumscribed reach. It confers on federal credit unions the right to "determine" the "fees or charges" and "other matters" that affect the "opening, maintaining and closing" of customer accounts. 12 C.F.R. § 701.35(c). But that power comes with limits—indeed the entire point of the regulation is to limit credit unions' power. *See* 12 U.S.C. § 1757(6) (federal credit unions "shall have power" to set "rates[] and conditions" on customer accounts only "within limitations prescribed by the" NCUA). Specifically, credit unions only have the power to determine fees and other matters related to account terms when they do so "consistent with" a series of legal obligations: They must comply with "this section" (that is, § 701.35(b)'s prohibition on misleading representations about the terms governing accounts), "Parts 707 and 740" (regulations under the Truth in Savings Act

and regulations governing disclosure practices), "other federal law," and the credit union's "contractual obligations." 12 C.F.R. § 701.35(c).

The preemptive scope of § 701.35(c) is thus correspondingly limited. Because it displaces only "[s]tate laws regulating *such activities*," *id.* (emphasis added), it applies only to credit unions' activities that comply with all of the above obligations, including federal law. That much is clear from the preemption clause's use of the phrase "such activities." "Such" captures only "the character, quality, or extent previously indicated or implied"—which, among other things, requires that a credit union's activities be "consistent with" federal law. *See Such*, Merriam-Webster Dictionary, https://perma.cc/WD77-WGBV. Consistent with this limited scope, courts have rejected arguments that this regulation preempts state-law claims against credit unions based on misrepresentations and breach of contract. *See, e.g.*, *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 488 (E.D.N.Y. 2020). So, a credit union claiming preemption under § 701.35(c) must, as a first step, carry its burden of demonstrating that its conduct complies with federal law.

By limiting preemption in this way, § 701.35(c) establishes a frequently employed preemption framework: If the basis for a state-law claim is conduct that violates federal law, there is no preemption. After all, when state law prohibits the same thing as federal law, "it is hard to see how they could conflict." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 579 (7th Cir. 2012) (no preemption under Home Owners

Loan Act for state claim based on violation of federal standard); *see also, e.g., Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) (although Atomic Energy Act generally preempts the field, it does not preempt use of state-law remedies to enforce federal standards); *First Nat. Bank in St. Louis v. State of Missouri*, 263 U.S. 640, 652 (1924); *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 987–88 (9th Cir. 2005) (employment-discrimination claim not preempted under National Bank Act provision that allows banks to fire employees "at pleasure" when same conduct violated federal law); *Wigod*, 673 F.3d at 579; *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1483 (2005) (holding that UCL claim based on a violation federal law is not preempted under National Bank Act); *Ward v. Soo Line R.R. Co.*, 901 F.3d 868, 871 (7th Cir. 2018) (even though Boiler Inspection Act preempted the field, negligence per se claim based on violation of the Act is not preempted); *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545 (8th Cir. 2018) (same for Locomotive Inspection Act).

**2.** Preemption under § 701.35(c) is also limited in a second way: It applies only to state laws "regulating" the determination of fees or other matters affecting the opening, closing, or maintenance of member accounts. As courts have explained, preemption clauses that displace only state law that "regulates" statutorily authorized conduct reflect a "limited preemptive intent." *Total TV,* 69 F.3d at 302. To "regulate," a state law must do more than just "impact" a federal scheme in some general sense; rather, a "common-sense view of the word" requires that the state law

"be specifically directed toward" the subject matter of the federal law. *Dedeaux*, 481 U.S. at 50 (interpreting "regulate" in the context of ERISA preemption). Put another way, state laws that dictate rules specific to the subject matter of the federal scheme "regulate," but generally applicable laws do not. *See, e.g.*, *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 839, 843 (9th Cir. 2009) (Montana statute requiring insurance commissioner to disapprove of contracts with "clauses vesting discretion in insurers" "regulates" insurance); *Total TV*, 69 F.3d at 301 (holding that a claim under California's Unfair Practices Act that would prohibit predatory pricing does not "regulate" rates because it is aimed only at "the seller's conduct" and does not directly set prices); *Spain v. Aetna Life Ins. Co.*, 11 F.3d 129, 132 (9th Cir. 1993) (per curiam) (because wrongful death claim based on "negligent administration of benefit[s]" is a "general tort" and "not specifically tailored" to insurance, it does not "regulate" insurance).

An express-preemption clause that bars state law "regulating" statutorily authorized conduct thus differs from its broader preemption counterparts that displace any state-law claims "relating to" or "concerning" federally authorized conduct. For instance, the Airline Deregulation Act's preemption clause displaces state laws "relating to [airline] rates." *Morales*, 504 U.S. at 374. As the Supreme Court has explained, that language "express[es] a broad pre-emptive purpose" so that even generally applicable state laws, like some consumer protection statutes, with only a

"connection to" to airline rates may be preempted. *Id.* at 383–84. But, the Court has made equally clear, preemption clauses that employ the phrase "regulate" preempt state law in a more "limited fashion" and cover only those state laws specifically "prescribing" certain conduct. *Id.* at 385 (drawing an explicit distinction between the two preemption approaches); *see also, e.g., Total TV*, 69 F.3d at 302 (observing that "[t]he Supreme Court has differentiated between" preemption clauses that use only the term "regulate" and those that use the phrase "related to"); *Cal. Rest. Ass'n*, 89 F.4th at 1103 (contrasting a preemption clause applicable to any state "regulation concerning" energy use with one that applies only to "regulations"); *cf. E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1046 (9th Cir. 2007) ("We ordinarily do not deem Congress to preempt laws of general applicability.").

By taking the approach of preempting state laws "regulating" a credit union's statutorily authorized activities, the NCUA's regulation preempts state law in only a "limited fashion." *Morales*, 504 U.S. at 385. As a result, a credit union seeking refuge in § 701.35(c) must, on top of establishing that its conduct complies with federal law, also establish that the state law is specifically directed at the terms and fees governing credit union accounts.

## II.   Because Navy Federal's returned-check fee violates federal law, Mr. King's claims are not preempted.

With § 701.35(c)'s scope properly understood, Navy Federal cannot meet its "burden in establishing its preemption defense." *Wyeth*, 555 U.S. at 569; *see also, e.g.,*

*Silkwood*, 464 U.S. at 255; *Lusnak*, 883 F.3d at 1191. The conduct it seeks to insulate from scrutiny is prohibited under federal law—and thus entirely beyond the reach of § 701.35(c). And regardless, Mr. King brings his claims under a generally applicable statute, not one specifically directed at credit unions' control over member accounts.

**1.** Navy Federal's preemption defense fails at the start because the credit union cannot satisfy the necessary first step for preemption under § 701.35(c): demonstrating that its fee practice complies with "other federal law." One of the "other federal laws" credit unions must comply with is the Consumer Financial Protection Act, which prohibits "unfair, deceptive, or abusive act[s] or practice[s]." 12 U.S.C. § 5536(a)(1)(B). A practice is "unfair" if (1) it "causes or is likely to cause substantial injury to consumers," (2) which "is not reasonably avoidable by consumers," and (3) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

Because preemption is an affirmative defense, Navy Federal must demonstrate compliance with the CFPA. *See Wyeth*, 555 U.S. at 569; *Silkwood*, 464 U.S. at 255. In this posture, that means Navy Federal had to show that the complaint's allegations, taken as true and construed in the light most favorable to Mr. King, establish as a matter of law that its fee practice comports with the CFPA. *See, e.g.*, *Lilly v. ConAgra Foods*, 743 F.3d 662, 664 (9th Cir. 2014). But Navy Federal didn't even try. That default alone provides a sufficient basis to deny its preemption defense.

And in any event, faced with the allegations in Mr. King's complaint, Navy Federal cannot possibly demonstrate compliance as a matter of law. *First*, Navy Federal cannot meet its burden to show that its fee practice does not cause "substantial injury." "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people.'" *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010). Here, "thousands" of people have had to pay Navy Federal's $15 penalty. ER-28; *see also* ER-63 ("[F]ees for returned checks impose concrete monetary harm on a large number of customers.").

*Second*, Navy Federal cannot establish that the injury those thousands of people sustained could reasonably have been avoided. "An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012). As the CFPB has explained, and Mr. King's experience illustrates, people subjected to returned-check fees where the check *writer* is at fault cannot reasonably avoid the harm. ER-63–64. Consumers are ordinarily "unaware" of whether the check writer has "insufficient funds" or "the check is written against a closed account"; they will not "normally be able to verify whether a check will clear"; and they therefore "have little to no control over" the underlying problem that generates the fee. *Id.* That reality is what led to Navy Federal imposing

the fee against Mr. King to his "surprise" (and despite "no fault" on his part). ER-27; *see also, e.g.*, *Sepanossian v. Nat'l Ready Mix Co.*, 97 Cal. App. 5th 192, 196, 205–06 (2023) (holding that contractual "energy" fee that was "untethered to any actual cost for 'energy'" was "unavoidable for customers who wished to purchase concrete from Ready Mix" and thus "unfair").

Navy Federal likewise provides no opportunity for its members to obtain a refund and thus to mitigate the harm after the fact. Indeed, this Court has explained that even where a company actually provides refunds, that is insufficient to render a practice "reasonably avoidable" if securing the refund "require[s] a substantial investment of time, trouble, aggravation, and money." *F.T.C.*, 604 F.3d at 1158; *see also Orkin Exterminating Co. v. F.T.C.*, 849 F.2d 1354, 1366 (11th Cir. 1988) (rejecting argument that policy of providing fee waivers only for consumers who complained constitutes reasonable means of mitigating harm). Mr. King put in the time and experienced the aggravation of navigating Navy Federal's customer-service labyrinth for hours, but got nothing back in the end: Navy Federal denied him a refund. ER-27. It follows that Mr. King could not reasonably avoid his injury.

*Third*, Navy Federal cannot show—and the complaint certainly does not allege—that the returned-check fee produces countervailing benefits that outweigh the harms to consumers like Mr. King. It doesn't deter people from writing bad checks, since it targets innocent depositors like Mr. King. And Navy Federal has

other contractual rights that protect it against any risk of lost funds, including the ability to delay making funds available and to deduct a corresponding amount from the depositor's account if the funds are made available but the check later bounces. ER-25, 26; ER-69.

Putting that all together, then, Navy Federal's no-fault fee policy violates the CFPA. So Navy Federal had no authority to apply its policy to begin with because it is not "consistent with" federal law. And, it follows, there is no preemption under § 701.35(c). *Cf., e.g., Silkwood*, 464 U.S. at 251; *First Nat. Bank*, 263 U.S. at 652; *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 987–88 (9th Cir. 2005); *Wigod*, 673 F.3d at 579; *Smith*, 135 Cal. App. 4th at 1483; *Ward*, 901 F.3d at 871; *Seats, Inc.*, 900 F.3d at 545.

**2.** Navy Federal also cannot provide "compelling evidence" of preemption because California's Unfair Competition Law does not "regulate" credit unions' fee determinations—the second requirement for preemption in § 701.35(c). As this Court has previously recognized, California's UCL is a "[s]tate law[] of general application, which merely require[s] all businesses . . . to refrain from fraudulent, unfair, or illegal behavior." *Martinez*, 598 F.3d at 555; *see also, e.g., Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Lab. Ass'n of the U.S. of Am. Pension Tr.*, 153 F. Supp. 3d 1217, 1256 (E.D. Cal. 2015) (holding that UCL does not "regulate" insurance because it "is a general statute enacted to protect against a wide variety of unlawful, unfair or fraudulent business acts or practices, and not directed to any specific industry"). In *Martinez*, this

Court observed that, in view of this broad and generic scope, the UCL is "not designed to regulate real estate lending." 598 F.3d at 555 (noting that the Office of the Comptroller of the Currency "specifically cited the UCL" as a generally applicable statute to which federally chartered banks remain subject). The same can be said here: The UCL does not regulate credit unions either.

And that's true for both UCL theories that Mr. King has advanced. His claim that Navy Federal violates the UCL's prohibition on "unfair" practices invokes the statute's standards for unfairness that apply to all manner of businesses and business practices. ER-32–33; ECF 25 at 14–15. Conduct is unfair under the UCL if it fails one of three tests: a balancing test that measures the "gravity of the harm" to victims against "utility" of the defendant's conduct, taking account of the defendant's motives; a "tethering" test that asks whether, irrespective of a direct violation of a statute, conduct violates a public policy embodied in a constitutional, statutory, or regulatory provision; or the same three-prong test that applies under the CPFA. *See, e.g.*, *People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1095 (2001) (applying balancing test to hold that practice of towing cars without property owner's authorization and charging excessive storage fees was unfair); *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1227 (N.D. Cal. 2014) (holding tethering test satisfied in data breach case based on violation of "California's public policy of protecting consumer data" reflected in multiple statutes); *Sepanossian*, 97 Cal. App. 5th at 205–06 (applying the same three-

prong test as the CFPA employs to seller of concrete products). Nothing in these standards is "specifically directed" at credit unions or their fee practices.

The same goes for Mr. King's claim that Navy Federal's fee policy runs afoul of the UCL's prohibition on "unlawful" business practices. This aspect of the UCL "borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1265 (2018). Where, as here, the borrowed statute (the CFPA) is itself a law of general applicability applied to a wide variety of covered entities for a wide variety of practices, it necessarily follows that the UCL functions as a law of general applicability. *Cf. F.T.C. v. AMG Servs., Inc.*, 2014 WL 910302, at *4 (D. Nev. Mar. 7, 2014) (holding that magistrate "correctly followed Ninth Circuit precedent" to determine that FTC Act—which, like the CFPA, prohibits unfair and deceptive practices—is "a statute of general applicability" that may be applied to tribes).

Navy Federal therefore cannot satisfy the second requirement of preemption under § 701.35(c)—establishing that the state law at issue is "regulating" its conduct. *See Dedeaux*, 481 U.S. at 50; *Total TV*, 69 F.3d at 301.

## III. The district court's preemption analysis disregarded § 701.35(c)'s text.

The district court's terse preemption analysis went astray by failing to heed the text of § 701.35(c) in two ways. First, it concluded that Mr. King's claims were preempted without determining whether Navy Federal had demonstrated that its

returned-check fee complies with federal law—the initial showing necessary to even bring the credit union's conduct potentially within the scope of § 701.35(c). And second, the district court failed to consider whether the UCL as applied here is a law "regulating" credit union activities because it mistakenly read § 701.35(c) to reach any state law that "concerns" a credit union's powers.

**1.** The district court appeared to recognize that Mr. King's claims are not preempted if Navy Federal's conduct violates federal law. In fact, Navy Federal didn't contend otherwise. Nonetheless, the district court accepted Navy Federal's argument that Mr. King could not show a violation of federal law because the CFPB's guidance on returned-check fees lacks the force of law.

To start, by requiring Mr. King to demonstrate that Navy Federal's conduct violated federal law, the district court improperly shifted the burden to Mr. King to disprove preemption. But preemption is an affirmative defense for which the defendant bears the burden. *Wyeth*, 555 U.S. at 569; *Silkwood*, 464 U.S. at 255; *Lusnak*, 883 F.3d at 1191. The district court therefore should have required Navy Federal to "affirmatively demonstrate" that, accepting the allegations in the complaint as true, its conduct complied with federal law. *See id.* It failed to do so.

At any rate, the district court's failure to recognize that Mr. King had alleged a violation of federal law rests on an erroneous premise. According to the district court, Mr. King asserted that Navy Federal's conduct violated federal law solely

"based on guidance promulgated by" the CFPB. ER-14. Based on that misunderstanding, the court reasoned that allowing Mr. King's claims to proceed would improperly give that guidance the "force and effect of law." *Id.*

But Mr. King alleges that Navy Federal's conduct—charging innocent customers fees—violates the Consumer Financial Protection Act itself, not just the CFPB's guidance. *See* ER-32–33; ECF 25 at 14–15, 19 (arguing that there "simply is no preemption" because Navy Federal's practice is "categorically 'unfair' under *the CFPA*") (emphasis added); *supra* at 26–28. To be sure, the guidance persuasively explains *why* Navy Federal's fee violates the statute, but the fee would still violate the Act even had the CFPB never addressed these indiscriminate fees. And so the guidance need not have the force of law to conclude that Mr. King's claims are not preempted. The district court erred in concluding otherwise.

**2.** The district court's decision also cannot stand because it expanded the preemptive scope of § 701.35(c) beyond what its text allows. In the court's view, § 701.35(c) preempts Mr. King's claims because they "concern[ ] [Navy Federal's] fee charging practices." ER-14.

But § 701.35(c) preempts "state laws *regulating*" covered credit union activities, not any claim that happens to "concern" those activities. As explained above, a state law that "regulates" credit union activities is one that is specifically directed at those activities. *Supra* at 22–23. "Concerns" has a much wider reach; it "has a broadening

effect, ensuring that the scope of a provision covers not only its subject but also matters *relating to* that subject." *Cal. Rest. Ass'n*, 89 F.4th at 1103 (emphasis added). In other words, barring any state-law claim that "concerns" credit union fees would "expand preemption beyond" the "direct" regulation of credit-union activities that the text of § 701.35(c) contemplates. *See id.* Indeed, the district court itself seemed to recognize this. The court acknowledged that a state-law fraud claim based on misleading statements about credit union fees is not preempted, even though that claim plainly "concerns" credit union fees. ER-14.

Of course, "concerns" is not what § 701.35(c) says. It employs the narrower phrasing of "regulating" to bar only laws that specifically target covered credit union activities.

And it does so despite the NCUA knowing how to issue broader preemptive regulations. Just one year before it first promulgated § 701.35(c)'s preemption clause, the NCUA issued a regulation broadly "preempt[ing] any state law purporting to limit or affect" the terms and conditions of loans made by federal credit unions. *See* 49 Fed. Reg. 30683-01 (Oct. 10, 1984); 12 C.F.R. § 701.21(b). Had the NCUA wanted § 701.35(c) to have that same broad reach, it could have employed that same formulation. *See also* 12 C.F.R. § 7.4007(c) (providing that a "national bank may exercise its deposit-taking powers without regard to state law limitations *concerning*" various subjects (emphasis added)). It didn't.

The district court's error was thus essentially the inverse of the argument that the Supreme Court rejected in *Morales*. There, Texas's attorney general argued that a statute preempting any state law "relating to rates, routes, or services of any carrier" "only pre-empts the States from actually prescribing rates, routes, or services. 504 U.S. at 385. But, the Supreme Court explained, "[h]ad the statute been designed to pre-empt state law in such a limited fashion, it would have forbidden the States to *regulate* rates, routes, services." *Id.* Here, the preemption clause does use that "limited" language and displaces only laws "regulating" credit union activities. But the district court read it to set aside all state-law claims even "concerning" credit union activities. ER-14. *Morales* confirms what § 701.35(c)'s plain text makes clear anyway: These standards are not the same. The district court erred in conflating them.

**3.** The district court offered no reason for straying from the regulation's text. The closest it came was citing an unpublished district court decision that broadly pronounced that it is "well established" that claims regarding "perceived unfairness in the fee practices themselves are preempted." *See Lambert v. Navy Fed. Credit Union*, 2019 WL 3843064, at *2 (E.D. Va. Aug. 14, 2019). But the only authority that *Lambert* cites for that proclamation is a case considering preemption under the National Bank Act, not the Federal Credit Union Act, *see Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012), and an unpublished district court case, *Whittington v. Mobiloil Fed.*

*Credit Union*, 2017 WL 6988193, at *6, 9 (E.D. Tex. Sept. 14, 2017), applying the National Bank Act preemption framework articulated in *Gutierrez* to a credit union simply because it is also a "financial institution." But preemption depends on the specific statute at issue, not whether the defendant can be described as a "financial institution."

Regardless, the test for preemption under the National Bank Act only undermines the district court's holding. As *Gutierrez* explains, it demands more than that a state-law claim merely "touches on" a federally chartered bank's powers, *id.* at 727—the equivalent of the district court's "concerns" standard. Instead, for the National Bank Act to preempt a "state law of general application," the state law must "prevent or significantly interfere with the national bank's exercise of its powers." *Id.* at 722; *see also Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1298 (2024) (summarizing the case law applying this standard in the National Bank Act context).

It "cannot be reasonably, much less persuasively, argued" that a "UCL cause of action based on alleged violations" of federal law prevents or significantly interferes with a credit union's ability to "exercise its . . . powers." *Smith*, 135 Cal. App. 4th at 1483. If the conduct violates federal law, then the credit union has no power to engage in it to begin with, and there can be no interference, significant or otherwise. *See also, e.g.*, *Martinez*, 598 F.3d at 557 (holding that UCL claims based on alleged violations of other state laws were preempted but addressing UCL claims

35

based on alleged violations of federal law on the merits); *Davis v. Wells Fargo Bank, N.A.*, 976 F. Supp. 2d 870, 882 (S.D. Tex. 2013) ("[C]laims relating to unlawful appraisals are rooted in duties arising under federal law, so state tort law liability based on violations of those federal statutes would not . . . significantly impair the exercise of authority, enumerated or incidental under the National Bank Act.").

Thus, even if it applied, the National Bank Act offers no support for the district court's atextual reading of 701.35(c).

**4.** The district court's expansive interpretation of § 701.35(c)'s preemption clause would also call into doubt the regulation's validity. An agency only has power to act "within the scope of its congressionally delegated authority." *Albrecht*, 587 U.S. at 315. And the delegation here is quite narrow: The Federal Credit Union Act grants the NCUA the power to prescribe "*limitations*" on the "terms, rates, and conditions" that a credit union establishes for member accounts. 12 U.S.C. § 1757(6) (emphasis added). Nothing in that delegation authorizes the NCUA to broadly preempt a state-law claim simply because it has some effect on, or "concerns," the terms and conditions a credit union sets on accounts—let alone to preempt state laws that provide a remedy for conduct that violates federal law. Nor would doing so make any sense in view of the Act's purposes; it was enacted to give people an alternative to the abuses of then existing financial institutions, not to strip them of state-law remedies for similar conduct that persisted. *See supra* at 4–5.

Rather than construe the regulation in a manner inconsistent with the Federal Credit Union Act's text and purpose, as the district court did, this Court should interpret the regulation in accordance with its plain text and the Act's underlying aims.

**CONCLUSION**

This Court should reverse.

Respectfully submitted,

/s/ Matthew W.H. Wessler
MATTHEW W.H. WESSLER
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JENNIFER BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

JEFFREY D. KALIEL
SOPHIA GOREN GOLD
KALIEL GOLD, PLLC
1100 15th Street NW
4th Floor
Washington, DC 20005
(202) 350-4783

August 7, 2024                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,977 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2024, I electronically filed the foregoing brief with Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered for CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler